IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

| | | |
|---|---|---|
| STEPHANIE S. SUTTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 325-115 |
| | ) | |
| BARREL PUBS, LLC d/b/a Pickle Barrel Cafe | ) | |
| and Sports Pub, and ROBERT C. JAWOSKI, | ) | |
| | ) | |
| Defendants. | ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff is proceeding *pro se* and *in forma pauperis* ("IFP") in the above-captioned case.  Because she is proceeding IFP, Plaintiff's amended complaint must be screened to protect potential defendants.  See Phillips v. Mashburn, 746 F.2d 782, 785 (11th Cir. 1984) (*per curiam*).

I.   **SCREENING THE AMENDED COMPLAINT**

A.   **BACKGROUND**

Plaintiff originally named two Defendants:  (1) Barrel Pubs, LLC and (2) Robert C. Jawoski. (Doc. no. 1, pp. 1, 2.)  In her amended complaint, Plaintiff only names Barrel Pubs, LLC as a Defendant, (doc. no. 13, p. 1), and she states in her objections to the Report and Recommendation screening her original complaint that she does not object to dismissal of Defendant Jawoski, (doc. no. 11, p. 7).  Taking all of Plaintiff's factual allegations as true, as the Court must for purposes of the present screening, the facts are as follows.

In mid-March 2024, Plaintiff met with Defendant Barrel Pubs, LLC's (hereinafter "Barrel Pubs") General Manager and another manager to discuss being hired as a manager at Barrel Pubs' Dublin restaurant. (Doc. no. 13, p. 13.) At this meeting, the General Manager and Plaintiff agreed on $14.00 hourly pay with quarterly bonuses ranging between $3,000 to $5,000. (Id.) This agreement placed Plaintiff "around or above" the $20.00 per hour "required pay." (Id.) The General Manager also stated Plaintiff would receive a raise if she obtained a satisfactory six-month performance review, and that Plaintiff would be promoted to General Manager once it became available. (Id. at 9.) Plaintiff began working as a manager at Barrel Pubs in late March 2024. (Id. at 13.)

At the beginning of her employment, Plaintiff informed the General Manager and Manager Avery about her "Sciatica condition." (Id.) Plaintiff shared that the condition was manageable as long as she remained in motion, but the numbness and pain "would become unbearable" if she had to stand in one spot for prolonged periods of time. (Id.) In late April 2024 or early May 2024, Plaintiff asked Manager Avery if she could sit on a stool while cutting vegetables before Barrel Pubs opened. (Id. at 14.) Manager Avery denied this request "with a laugh." (Id.) In late April or early May 2024, Plaintiff developed "gastric issues" due to the stresses of working at a large restaurant with a significant amount of business without proper training. (Id.)

While working at Barrel Pubs, Plaintiff experienced "issues" with managers in a way she never had before, even though she has thirty years of experience and a great reputation in the local restaurant industry. (Id. at 13, 14) For example, when Plaintiff was still new to her manager role, Manager Avery "humiliated" her in front of several servers by asking "how dumb are you?" (Id. at 14) Additionally, at the end of May 2024, Plaintiff discovered other

managers had instructed the servers not to ask Plaintiff for help because "Plaintiff didn't know how to do her job[] and wouldn't be there much longer." (Id.)

In July 2024, Plaintiff received an MRI of her digestive system, which revealed her bowels were "full" and she had degenerative scoliosis in her lower back. (Id. at 15.) Plaintiff discussed the MRI results with the General Manager and asked if she could not be scheduled to work the kitchen line due to her medical issues. (Id.) Plaintiff offered to fill in temporarily if needed. (Id.) The General Manager told Plaintiff, "you will have to do it some." (Id.)

In late August or early September 2024,[1] a male manager named Chuck began working at Barrel Pubs. (Id. at 16.) Manager Chuck was a personal friend of Barrel Pubs' owners and had his personal cell phone connected to the restaurant's security system. (Id.) He told Plaintiff he was using the security system to investigate "some 'mischief.'" (Id.) Plaintiff had no concerns about Manager Chuck's surveillance until she realized it was targeted towards her specifically. (Id.) Plaintiff had not done anything intentionally wrong and found this surveillance "weird." (Id.)

Around October or November 2024, Plaintiff was "forced to fire a mentally challenged dishwasher" named Chad. (Id.) Plaintiff knew the scheduling manager had set Chad up to fail, but she followed orders and fired Chad anyway. (Id.) Around this time, Plaintiff also realized at least one or more managers were altering her spreadsheets and changing her passwords on the computer to stop her from finishing her work on time. (Id.) For example, one time Plaintiff and the General Manager were working together on the computer, and the General Manager pointed to the place where Plaintiff needed to log the check she had just

---

[1] The amended complaint alleges these events occurred in late August or early September 2025, but this year appears to be a scrivener's error because Plaintiff later alleges she was fired in March 2025. (Doc. no. 13, p. 19.)

written.  (Id.)  Plaintiff followed her instructions.  (Id.)  However, a few days later, the General Manager accused Plaintiff of failing to enter the check in the correct place after she had told Plaintiff exactly where to put it a few days earlier.  (Id. at 17.)  As a result of this pattern of manipulation, Plaintiff began to check the previous days' data daily to correct it.  (Id.)

In October 2024, Plaintiff observed that the other managers, including Chuck, had received their quarterly bonuses.  (Id.)  Plaintiff reminded the General Manager her six months review was overdue, and Plaintiff received a "satisfactory" review a few days later.  (Id.)  The only constructive feedback Plaintiff received from the General Manager was "she would like to see more of [] Plaintiff in the kitchen."  (Id.)  Plaintiff then received a partial quarterly bonus totaling $1,800.  (Id.)

By December 2024, Plaintiff enjoyed a positive reputation among "many of [Barrel Pubs'] subordinates," who took her as someone who would "stand up for the 'under dogs'" to the General Manager.  (Id.)  By this time, Plaintiff had also started to work in the kitchen more. (Id.)  In January 2025, Plaintiff felt like "the 'crazy' tricks[] or malicious acts had stopped," but her relief was short-lived because the targeted surveillance soon "got more intense" and she "was scrutinized over every detail."  (Id.)  For example, Manager Chuck instructed Plaintiff "not to stay so late at night" even if she had not finished balancing the books.  (Id. at 17-18.) He also once called the Barrel Pubs phone to tell Plaintiff to make regular customers leave because it was after closing.  (Id. at 18.)  However, Plaintiff did not mind staying late with the customers because they were watching a sports game.  (Id.)

In late February 2025, a pregnant bartender named MacKinsey asked to have a private, confidential conversation with Plaintiff.  (Id.)  MacKinsey "had a lot to say," and Plaintiff mostly agreed with it.  (Id.)  Plaintiff knew Manager Chuck could be listening to the

4

conversation simultaneously as it happened, but she never thought that anyone would rewind the recording to listen to it after.  (Id.)  Plaintiff assumed the conversation would be a private matter because it was held in an office with the door shut.  (Id.)  The very next day, other managers secretly reviewed the footage to hear what was said.  (Id.)  When Plaintiff returned to work several days later for her next shift, the "things that had been discussed [between Plaintiff and MacKinsey] . . . had been done."  (Id. at 18-19.)  MacKinsey accused Plaintiff of betraying her request for confidentiality.  (Id. at 19.)

On March 2, 2025, another bartender who had helped the managers "correct the problems at the bar" followed Plaintiff into the restroom to tell Plaintiff that the managers' actions in listening to the recording of Plaintiff's conversation with MacKensey were "illegal." (Id.)  This bartender also told Plaintiff that managers were listening to conversations of bar patrons as well.  (Id.)  On March 3, 2025, before Plaintiff went to work, she contacted an attorney on the platform, "Just Ask A Lawyer," to figure out the legality of "[the] [t]argeted [s]urveillance, [e]avesdropping, being treated as an exempt salary manager, not receiving pay when not on the clock[] but performing managerial duties and responsibilities on off time, not receiving quarterly bonuses as promised, [] the pregnant bartender Mac[K]insey being removed from the bar schedule[,] [] being forced to fire a mentally disabled dishwasher Chad," and the overall "hostile work environment."  (Id. at 4, 19.)  The attorney with whom Plaintiff spoke on the platform informed her "it was all illegal" and suggested Plaintiff tell the "higher ups of the company."  (Id. at 19.)

Plaintiff immediately told MacKinsey about the attorney's advice, and that she planned to speak to the General Manager about these issues when she arrived at work later in the afternoon.  (Id. at 20.)  However, upon her arrival at work, the General Manager demanded

Plaintiff's keys and told her she was fired. (Id.) When Plaintiff asked why, the General Manager said, "Because you talked to a lawyer and don't have the best interest of the company at heart." (Id.) Plaintiff never received a separation notice. (Id. at 21.)

Plaintiff had already started to look for comparable employment in the weeks prior to her termination, but after the termination, employers wanted a copy of the separation notice, which she could not provide, and they wanted to know why Plaintiff was fired. (Id.) Plaintiff was honest in response to these questions, and the recruiters would tell Plaintiff she should contact the Equal Employment Opportunity Commission ("EEOC") but then never responded back to her. (Id.)

Plaintiff seeks monetary damages, including compensatory, back pay, specific damages, and punitive, as well as costs and fees. (Id. at 23-26.) She also seeks equitable relief. (Id. at 2.)

Plaintiff appended the EEOC Charge of Discrimination to her complaint. (Id. at 30-32.) In the section inquiring into the particulars of her EEOC claim, Plaintiff describes being recorded by Barrel Pubs' management without her consent. (Id. at 30.) She also alleges Barrel Pub fired her after she "sought assistance with this matter." (Id.) Although she did not attach her EEOC Notice of Right to Sue letter, Plaintiff avers she requested a letter "[o]n or around August 20, 2025," and the EEOC Investigator issued one "immediately." (Id. at 22.) In one of the emails attached as an exhibit to her amended complaint, Plaintiff states she received a Notice of Right to Sue letter on August 21. (Id. at 34.)

**B.      DISCUSSION**

**1.      Legal Standard for Screening**

The amended complaint or any portion thereof may be dismissed if it is frivolous,

malicious, or fails to state a claim upon which relief may be granted, or if it seeks monetary relief from a defendant who is immune to such relief. See 28 U.S.C. § 1915(e)(2)(B). A claim is frivolous if it "lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989). "Failure to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard as dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6)." Wilkerson v. H & S, Inc., 366 F. App'x 49, 51 (11th Cir. 2010) (citing Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th Cir. 1997)).

To avoid dismissal for failure to state a claim upon which relief can be granted, the allegations in the complaint must "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. While Rule 8(a) of the Federal Rules of Civil Procedure does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678. The complaint is insufficient if it "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,'" or if it "tenders 'naked assertions' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 555, 557). In short, the complaint must provide a "'plain statement' possess[ing] enough heft to 'sho[w] that the pleader is entitled to relief.'" Twombly, 550 U.S. at 557 (quoting Fed. R. Civ. P. 8(a)(2)).

Finally, the Court affords a liberal construction to a *pro se* litigant's pleadings, holding them to a more lenient standard than those drafted by an attorney. Erickson v. Pardus, 551 U.S. 89, 94 (2007); Haines v. Kerner, 404 U.S. 519, 520 (1972) (*per curiam*). However, this liberal

construction does not mean that the Court has a duty to re-write the complaint. See Bilal v. Geo Care, LLC, 981 F.3d 903, 911 (11th Cir. 2020); Snow v. DirecTV, Inc., 450 F.3d 1314, 1320 (11th Cir. 2006).

### 1.    Plaintiff No Longer Brings Any Claim Against Defendant Jawoski

As the Court previously explained, (doc. no. 12, p. 2), Plaintiff's amended complaint supersedes and replaces in its entirety the previous pleading filed by Plaintiff. See Hoefling v. City of Miami, 811 F.3d 1271, 1277 (11th Cir. 2016). Plaintiff originally named Robert C. Jawoski as a Defendant. (See doc. no. 1.) However, Plaintiff's amended complaint no longer names this individual as a Defendant, and Plaintiff does not object to dismissal of this Defendant. (See doc. no. 11, p. 7; doc. no. 13.) As Plaintiff does not mention this individual anywhere in the statement of claim in the amended complaint and does not make any allegations associating this Defendant with a legal wrong, dismissal is therefore appropriate. See Douglas v. Yates, 535 F.3d 1316, 1321-22 (11th Cir. 2008) ("While we do not require technical niceties in pleading, we must demand that the complaint state with some minimal particularity how overt acts of the defendant caused a legal wrong."). Accordingly, Defendant Robert C. Jawoski should be dismissed.

### 2.    Plaintiff Fails to State a Claim for Title VII Retaliation Because She Does Not Allege She Engaged In Statutorily Protected Activity Under Title VII

"To state a claim for retaliation under Title VII, a plaintiff must allege the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse action." Arafat v. Sch. Bd. of Broward Cnty., 549 F. App'x 872, 874 (11th Cir. 2013) (per curiam) (citing Pipkins v. City of Temple Terrace, 267 F.3d 1197, 1201 (11th Cir. 2001)). Here, Plaintiff alleges she engaged in protected activity by

contacting an attorney on the platform "Just ask a lawyer" to inquire about Barrel Pubs' purported unlawful practices of targeted surveillance, eavesdropping, classifying Plaintiff as an exempt salary manager, not paying Plaintiff even when she was performing managerial duties during her off time, not paying her promised quarterly bonuses, removing a pregnant bartender from the bar schedule, forcing Plaintiff to fire a mentally disabled employee, and a hostile work environment.  (Doc. no. 13, pp. 4, 19.)

As an initial matter, as noted in the Court's Report and Recommendation screening Plaintiff's original complaint, (doc. no. 9, pp. 7-8), it is not clear that Plaintiff's activity in seeking legal advice on "Just ask a lawyer" about Barrel Pub's employment practices constitutes statutorily protected activity.  There are two ways to establish Title VII protected activity:  "whether [Plaintiff] 'opposed any practice made an unlawful employment practice by' Title VII or 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under' Title VII."  Vincent v. Jefferson Cnty. Bd. of Educ., 152 F.4th 1339, 1353 (11th Cir. 2025) (quoting 42 U.S.C. § 2000e-3(a)).  Plaintiff does not allege she made a charge, testified, assisted, or participated in any relevant proceeding under Title VII prior to her termination, and thus, she must establish that acquiring legal assistance shows she "opposed any practice made an unlawful employment practice" under Title VII.  42 U.S.C. § 2000e-3(a).

However, the Court need not decide whether asking an attorney for legal advice constitutes opposition because Plaintiff's claim fails for a more fundamental reason:  none of the alleged unlawful activities about which she sought legal advice are the kind of activity protected under Title VII.  Title VII defines unlawful employment practices as various forms of discrimination based on an "individual's race, color, religion, sex, or national origin."  42

U.S.C. § 2000e-2.  Nowhere does Plaintiff allege she experienced discrimination based on any of these protected Title VII characteristics, much less that was she retaliated against for opposing this type of discrimination.  (See generally doc. no. 13.)  Rather, her consultation with legal counsel centered around practices untethered to Title VII's protected categories.

Plaintiff does allege that she sought legal advice about a "hostile work environment." (Id. at 4, 12.)  It is clear from the entirety of the amended complaint, however, that Plaintiff does not use this phrase in the Title VII context.  To state a claim under Title VII for a hostile work environment, Plaintiff must "allege that: (1) [s]he belongs to a protected group; (2) [s]he was subjected to unwelcome harassment; (3) the harassment was based on h[er] membership in the protected group; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability."  Edwards v. Prime, Inc., 602 F.3d 1276, 1300 (11th Cir. 2010).  Here, Plaintiff never alleges any facts to suggest her workplace environment was hostile because of her or any other employee's membership in a Title VII protected group.  (See generally doc. no. 13.)

Ultimately, "it is not enough for a plaintiff to show that she opposed garden-variety unfairness, harsh treatment in the workplace, or behavior that is prohibited under other laws; she is *only* protected from retaliation if she opposed or complained about a practice specifically prohibited by Title VII."  Lowry v. Regis Salons Corp., No. 1:05 CV 1970, 2006 WL 2583224, at *10 (N.D. Ga. Sept. 6, 2006) (emphasis in original); see also Vincent, 152 F.4th at 1353 (concluding plaintiff's action in "report[ing] [co-worker] for 'allowing male athletes to engage in simulating sex acts'" did not "establish that [plaintiff] was opposing an employment practice that was unlawful under Title VII, or that she was participating in a Title VII proceeding or

investigation" because the report was not based on sex discrimination or any other Title VII category).  Other district courts in the Eleventh Circuit have also found no statutorily protected activity when the alleged activity did not connect to discrimination based on a protected Title VII category.  See, e.g., Ogato v. DeKalb Cnty. (Watershed), No. 1:24-CV-04129, 2024 WL 6084027, at *5 (N.D. Ga. Dec. 3, 2024) (dismissing plaintiff's case after concluding "[p]laintiff did not allege in that complaint that he was subjected to mistreatment or unfair treatment because of his national origin or other characteristic protected by Title VII, so it does not constitute statutorily protected activity"), *adopted by* 2024 WL 6084019 (N.D. Ga. Dec. 31, 2024); Cox v. Fulton Cnty. Sch. Dist., No. 1:19-CV-04520, 2022 WL 22308805, at *33 (N.D. Ga. Jan. 21, 2022) ("Although [plaintiff's] November 8 email to [supervisor] 'used buzz words such as harassment and [discrimination],' he 'never referenced discrimination on the basis of a protected classification or retaliation for suggesting discrimination on the basis of a protected classification.'" (citations omitted)), *adopted by* 2023 WL 9418799 (N.D. Ga. Feb. 7, 2023).

For all these reasons, the Title VII retaliation claim should be dismissed.

> **3.      Plaintiff's ADA Claims Should Be Dismissed for Failure to Exhaust Administrative Remedies, and to the Extent She Exhausted Her ADA Retaliation Claim, It Still Fails Because She Does Not Establish Statutorily Protected Activity or Causation**

Plaintiff brings ADA claims for retaliation, disability discrimination, and a failure to accommodate her disability.[2]  (Doc. no. 13, pp. 4-6.)  However, her ADA claims fail because she did not first exhaust her administrative remedies before filing the instant lawsuit.  To the extent

---

[2] Although Plaintiff alleges Count II is for "Disability Discrimination and Failure to Accommodate in Violation of the ADA" in her amended complaint, (doc. no. 13, p. 4), the substances of her allegations also includes ADA retaliation, (see id. at 4-6).

her ADA retaliation claim is exhausted because it clarifies her EEOC charge, it should be dismissed because it fails on the merits.

The procedural requirements to sue for an ADA claim and a Title VII claim are identical. Zillyette v. Capital One Fin. Corp., 179 F.3d 1337, 1339 (11th Cir. 1999) (noting identical procedural requirements exist under Title VII and ADA); see also 42 U.S.C. § 12117(a). "Before filing suit under . . . the ADA . . . a plaintiff must exhaust all available administrative remedies by filing a charge with the EEOC." Anderson v. Embarq/Sprint, 379 F. App'x 924, 926 (11th Cir. 2010) (*per curiam*) (citing 42 U.S.C. § 12117(a)). For actions under the ADA, a plaintiff must receive a right-to-sue letter from the EEOC before filing suit based on the allegations in the corresponding charge. Shaw v. Emory Univ., No. 123CV01374, 2024 WL 1009521, at *3 (N.D. Ga. Jan. 10, 2024) (citing Jackson v. Seaboard Coast Line R.R. Co., 678 F.2d 992, 1010 (11th Cir. 1982)), *adopted by* 2024 WL 1009537 (N.D. Ga. Feb. 2, 2024).

Plaintiff filed a charge with the EEOC on August 20 or August 21, 2025, which she attached to her amended complaint.[3] (Doc. no. 13, pp. 30-32.) However, her EEOC charge makes no mention of discrimination on the basis of disability, much less that Plaintiff experienced any medical issues. (See id.) Instead, Plaintiff only complains about the alleged illegal eavesdropping and recording by management and explains she sought outside legal assistance about these practices. (Id. at 30.) She further contends Barrel Pubs retaliated by firing her once management learned about her legal consultation. (Id.) Ultimately, Plaintiff never connects the eavesdropping and her termination to her alleged disabilities in her EEOC

---

[3] Although Plaintiff did not attach her Notice of Right to Sue letter to her complaint, she avers she received this letter on August 20 or 21. (Doc. no. 13, pp. 23, 34.) At this stage in the proceedings, the Court presumes this allegation is accurate.

charge.  (See id. 30-31.)

"A plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Mulhall v. Advance Sec., Inc., 19 F.3d 586, 589 n.8 (11th Cir. 1994).  Moreover, the Eleventh Circuit "has noted that judicial claims are allowed if they 'amplify, clarify, or more clearly focus' the allegations in the EEOC complaint, but has cautioned that allegations of new acts of discrimination are inappropriate." Gregory v. Georgia Dep't of Hum. Res., 355 F.3d 1277, 1279-80 (11th Cir. 2004) (*per curiam*) (quoting Wu v. Thomas, 863 F.2d 1543, 1547 (11th Cir. 1989)).

Here, because Plaintiff did not mention her disabilities in her EEOC charge, her ADA claims are not properly before the Court.  Regarding her ADA discrimination and failure to accommodate claims, there is no mention of her underlying disabilities in the EEOC charge or the ways in which Barrel Pubs purportedly discriminated against her or failed to accommodate her disabilities.  Rather, the EEOC charge entirely centers around the eavesdropping scheme and Plaintiff's subsequent termination, which she states was retaliation for consulting an attorney.  (See doc. no. 13, pp. 30-31.)  Thus, her ADA discrimination and failure to accommodate claims are new allegations and cannot be considered.

Likewise, regarding her ADA retaliation claim, Plaintiff again does not provide any facts in the EEOC charge to show her termination was because of her disabilities.  As described, "[a] plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Mulhall, 19 F.3d at 589 n.8.  Here, on its face, the EEOC charge provides no indication her termination had anything to do with her underlying disabilities because it never discusses her medical

13

issues.  (Doc. no. 13, pp. 30-31.)

What's more, the facts alleged in the amended complaint, and the email exchange with the EEOC Investigator appended thereto, further support that the scope of the EEOC investigation did not involve retaliation based on her alleged disabilities.  (Id. at 21-22, 33-36.) Plaintiff concedes she did not reveal information about her sciatica or scoliosis to the EEOC Investigator because she "believed revealing this information would not be in her best interests."  (Id. at 21.)  Indeed, after a discussion with Plaintiff about her case, the EEOC Investigator told Plaintiff, "unless [her allegations] had to do with race, sex, religion, age, or disability[,] there was nothing he could do."  (Id. at 21-22.)  Then, almost a month after receiving her EEOC Notice of Right to Sue letter, Plaintiff emailed the EEOC Investigator to explain she had recently realized the eavesdropping seemed connected to her medical issues, and she requested an amendment of her EEOC charge.  (Id. at 34-35.)  The EEOC Investigator informed Plaintiff she could not amend her charge because it was closed and a Notice of Right to Sue letter had already been issued.  (Id. at 35-36.)  For these reasons, Plaintiff failed to exhaust her ADA retaliation claim, and dismissal of the claim is appropriate.

Nonetheless, even if the Court concluded Plaintiff's ADA retaliation claim had been properly exhausted, this claim fails on the merits.  The ADA's anti-retaliation provision states that "[n]o person shall discriminate against any individual . . . because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).  ADA retaliation claims are assessed under the same framework employed for retaliation claims under Title VII.  Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1287 (11th Cir. 1997).  "To establish a prima facie case of retaliation under the ADA, a plaintiff must show that: (1) she engaged in a

14

statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the adverse action and her protected expression." Parker v. Econ. Opportunity for Savannah-Chatham Cnty. Area, Inc., 587 F. App'x 631, 633 (11th Cir. 2014) (*per curiam*) (citing Stewart, 117 F.3d at 1287).

First, similar to the discussion about her Title VII retaliation claim, Plaintiff does not allege her conduct in contacting a lawyer was protected activity under the ADA, as she does not allege she discussed her disabilities with legal counsel.  (See generally doc. no. 13.) Instead, she discussed targeted surveillance, eavesdropping, being treated as an exempt salary manager, not receiving pay when not on the clock but performing managerial duties, not receiving quarterly bonuses as promised, the pregnant bartender MacKinsey's removal from the bar schedule, that she was forced to fire a mentally disabled dishwasher Chad, and a hostile work environment.[4]  (Id. at 4, 19.)  Because there is no indication her activity was protected by the ADA, her claim fails.

Further, throughout her amended complaint, Plaintiff consistently alleges she was terminated for seeking legal advice about Barrel Pub's surveillance, eavesdropping, and other issues unrelated to her own disabilities.  (Id. at 10-12, 19.)  She does not allege any causal connection between her disabilities and her termination beyond summarily stating her termination was because of her disabilities.  (Id. at 5-6.)  Although Plaintiff attempts to point

---

[4] As with her Title VII retaliation claim, Plaintiff's mere use of the phrase "hostile work environment" in her list of topics discussed with the attorney is insufficient to invoke the retaliation protection of the ADA.  (See doc. no. 13.)  Notably, it is not yet settled in the Eleventh Circuit whether an ADA hostile work environment claim is cognizable, though district courts in this Circuit have assumed such a claim exists.  See Doe v. Directions for Mental Health, Inc., No. 8:24-CV-02530-WFJ-LSG, 2025 WL 589044, at *4 (M.D. Fla. Feb. 24, 2025) (stating "the Eleventh Circuit has never held in a published opinion that a hostile work environment claim exists under the ADA" but also noting "several district courts within the circuit have assumed this claim exists" and citing to these cases).

to the "suspicious timing" between her disability accommodations request and the surveillance to prove causation, (id. at 6), even accepting that this timing is suspicious, she states no facts connecting her termination to her accommodation request. Without additional detail to support the causal connection, this claim is too speculative. Accordingly, because she does not establish she engaged in protected activity under the ADA, nor does she allege sufficient facts to show causation, her ADA retaliation claim should be dismissed.

In sum, Plaintiff's ADA claims for retaliation, discrimination, and failure to accommodate should be dismissed for failure to exhaust administrative remedies. See Burnett v. City of Jacksonville, Fla., 376 F. App'x 905, 907-908 (11th Cir. 2010) (*per curiam*) (plaintiff must allege exhaustion of administrative remedies in complaint). Her ADA retaliation claim fails for the additional reason that she does not allege two necessary elements.

## II.    CONCLUSION

For the reasons explained above, the Court **REPORTS** and **RECOMMENDS** that Defendant Jawoski be **DISMISSED**, and that Plaintiff's Title VII retaliation claim and ADA claims against Defendant Barrel Pub be **DISMISSED**. In a companion Order, the Court allows to proceed, against Defendant Barrel Pub only, Plaintiff's claims for violation of the Equal Pay Act, violation of the Fair Labor Standards Act, breach of contract, promissory estoppel, and invasion of privacy.

SO REPORTED and RECOMMENDED this 20th day of March, 2026, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

16