IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

| | | |
|---|---|---|
| STEPHANIE S. SUTTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 325-115 |
| | ) | |
| BARREL PUBS, LLC d/b/a Pickle Barrel Cafe | ) | |
| and Sports Pub, and ROBERT C. JAWOSKI, | ) | |
| | ) | |
| Defendants. | ) | |

_____

**O R D E R**

_____

Plaintiff is proceeding pro se and *in forma pauperis* ("IFP") in the above-captioned case. Because she is proceeding IFP, Plaintiff's amended complaint must be screened to protect potential defendants. <u>Phillips v. Mashburn</u>, 746 F.2d 782, 785 (11th Cir. 1984). Pleadings drafted by *pro se* litigants must be liberally construed, <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21 (1972), but the Court may dismiss a complaint, or any part thereof, that is frivolous or malicious or that fails to state a claim upon which relief may be granted. 28 U.S.C. §§ 1915(e)(2)(B)(i) & (ii).

## I.    SCREENING THE AMENDED COMPLAINT

### A.    BACKGROUND

Plaintiff originally named two Defendants: (1) Barrel Pubs, LLC and (2) Robert C. Jawoski. (Doc. no. 1, pp. 1, 2.) In her amended complaint, Plaintiff only names Barrel Pubs, LLC as a Defendant, (doc. no. 13, p. 1), and she states in her objections to the Report and Recommendation screening her original complaint that she does not object to dismissal of

Defendant Jawoski, (doc. no. 11, p. 7). Taking all of Plaintiff's factual allegations as true, as the Court must for purposes of the present screening, the facts are as follows.

In mid-March 2024, Plaintiff met with Defendant Barrel Pubs, LLC's (hereinafter "Barrel Pubs") General Manager and another manager to discuss being hired as a manager at Barrel Pubs' Dublin restaurant. (Doc. no. 13, p. 13.) At this meeting, the General Manager and Plaintiff agreed on $14.00 hourly pay with quarterly bonuses ranging between $3,000 to $5,000. (Id.) This agreement placed Plaintiff "around or above" the $20.00 per hour "required pay." (Id.) The General Manager also stated Plaintiff would receive a raise if she obtained a satisfactory six-month performance review, and that Plaintiff would be promoted to General Manager once it became available. (Id. at 9.) Plaintiff began working as a manager at Barrel Pubs in late March 2024. (Id. at 13.)

At the beginning of her employment, Plaintiff informed the General Manager and Manager Avery about her "Sciatica condition." (Id.) Plaintiff shared that the condition was manageable as long as she remained in motion, but the numbness and pain "would become unbearable" if she had to stand in one spot for prolonged periods of time. (Id.) In late April 2024 or early May 2024, Plaintiff asked Manager Avery if she could sit on a stool while cutting vegetables before Barrel Pubs opened. (Id. at 14.) Manager Avery denied this request "with a laugh." (Id.) In late April or early May 2024, Plaintiff developed "gastric issues" due to the stresses of working at a large restaurant with a significant amount of business without proper training. (Id.)

While working at Barrel Pubs, Plaintiff experienced "issues" with managers in a way she never had before, even though she has thirty years of experience and a great reputation in the local restaurant industry. (Id. at 13, 14) For example, when Plaintiff was still new to her manager role, Manager Avery "humiliated" her in front of several servers by asking "how

2

dumb are you?"  (Id. at 14)  Additionally, at the end of May 2024, Plaintiff discovered other managers had instructed the servers not to ask Plaintiff for help because "Plaintiff didn't know how to do her job[] and wouldn't be there much longer."  (Id.)

In July 2024, Plaintiff received an MRI of her digestive system, which revealed her bowels were "full" and she had degenerative scoliosis in her lower back.  (Id. at 15.)  Plaintiff discussed the MRI results with the General Manager and asked if she could not be scheduled to work the kitchen line due to her medical issues.  (Id.)  Plaintiff offered to fill in temporarily if needed.  (Id.)  The General Manager told Plaintiff, "you will have to do it some."  (Id.)

In late August or early September 2024,[1] a male manager named Chuck began working at Barrel Pubs.  (Id. at 16.)  Manager Chuck was a personal friend of Barrel Pubs' owners and had his personal cell phone connected to the restaurant's security system.  (Id.)  He told Plaintiff he was using the security system to investigate "some 'mischief.'"  (Id.)  Plaintiff had no concerns about Manager Chuck's surveillance until she realized it was targeted towards her specifically.  (Id.)  Plaintiff had not done anything intentionally wrong and found this surveillance "weird."  (Id.)

Around October or November 2024, Plaintiff was "forced to fire a mentally challenged dishwasher" named Chad.  (Id.)  Plaintiff knew the scheduling manager had set Chad up to fail, but she followed orders and fired Chad anyway.  (Id.)  Around this time, Plaintiff also realized at least one or more managers were altering her spreadsheets and changing her passwords on the computer to stop her from finishing her work on time.  (Id.)  For example, one time Plaintiff and the General Manager were working together on the computer, and the

---

[1] The amended complaint alleges these events occurred in late August or early September 2025, but this year appears to be a scrivener's error because Plaintiff later alleges she was fired in March 2025. (Doc. no. 13, p. 19.)

General Manager pointed to the place where Plaintiff needed to log the check she had just written. (Id.) Plaintiff followed her instructions. (Id.) However, a few days later, the General Manager accused Plaintiff of failing to enter the check in the correct place after she had told Plaintiff exactly where to put it a few days earlier. (Id. at 17.) As a result of this pattern of manipulation, Plaintiff began to check the previous days' data daily to correct it. (Id.)

In October 2024, Plaintiff observed that the other managers, including Chuck, had received their quarterly bonuses. (Id.) Plaintiff reminded the General Manager her six months review was overdue, and Plaintiff received a "satisfactory" review a few days later. (Id.) The only constructive feedback Plaintiff received from the General Manager was "she would like to see more of [] Plaintiff in the kitchen." (Id.) Plaintiff then received a partial quarterly bonus totaling $1,800. (Id.)

By December 2024, Plaintiff enjoyed a positive reputation among "many of [Barrel Pubs'] subordinates," who took her as someone who would "stand up for the 'under dogs'" to the General Manager. (Id.) By this time, Plaintiff had also started to work in the kitchen more. (Id.) In January 2025, Plaintiff felt like "the 'crazy' tricks[] or malicious acts had stopped," but her relief was short-lived because the targeted surveillance soon "got more intense" and she "was scrutinized over every detail." (Id.) For example, Manager Chuck instructed Plaintiff "not to stay so late at night" even if she had not finished balancing the books. (Id. at 17-18.) He also once called the Barrel Pubs phone to tell Plaintiff to make regular customers leave because it was after closing. (Id. at 18.) However, Plaintiff did not mind staying late with the customers because they were watching a sports game. (Id.)

In late February 2025, a pregnant bartender named MacKinsey asked to have a private, confidential conversation with Plaintiff. (Id.) MacKinsey "had a lot to say," and Plaintiff mostly agreed with it. (Id.) Plaintiff knew Manager Chuck could be listening to the

4

conversation simultaneously as it happened, but she never thought that anyone would rewind the recording to listen to it after. (Id.) Plaintiff assumed the conversation would be a private matter because it was held in an office with the door shut. (Id.) The very next day, other managers secretly reviewed the footage to hear what was said. (Id.) When Plaintiff returned to work several days later for her next shift, the "things that had been discussed [between Plaintiff and MacKinsey] . . . had been done." (Id. at 18-19.) MacKinsey accused Plaintiff of betraying her request for confidentiality. (Id. at 19.)

On March 2, 2025, another bartender who had helped the managers "correct the problems at the bar" followed Plaintiff into the restroom to tell Plaintiff that the managers' actions in listening to the recording of Plaintiff's conversation with MacKensey were "illegal." (Id.) This bartender also told Plaintiff that managers were listening to conversations of bar patrons as well. (Id.) On March 3, 2025, before Plaintiff went to work, she contacted an attorney on the platform, "Just Ask A Lawyer," to figure out the legality of "[the] [t]argeted [s]urveillance, [e]avesdropping, being treated as an exempt salary manager, not receiving pay when not on the clock[] but performing managerial duties and responsibilities on off time, not receiving quarterly bonuses as promised, [] the pregnant bartender Mac[K]insey being removed from the bar schedule[,] [] being forced to fire a mentally disabled dishwasher Chad," and the overall "hostile work environment." (Id. at 4, 19.) The attorney with whom Plaintiff spoke on the platform informed her "it was all illegal" and suggested Plaintiff tell the "higher ups of the company." (Id. at 19.)

Plaintiff immediately told MacKinsey about the attorney's advice, and that she planned to speak to the General Manager about these issues when she arrived at work later in the afternoon. (Id. at 20.) However, upon her arrival at work, the General Manager demanded Plaintiff's keys and told her she was fired. (Id.) When Plaintiff asked why, the General

Manager said, "Because you talked to a lawyer and don't have the best interest of the company at heart." (Id.)  Plaintiff never received a separation notice. (Id. at 21.)

Plaintiff had already started to look for comparable employment in the weeks prior to her termination, but after the termination, employers wanted a copy of the separation notice, which she could not provide, and they wanted to know why Plaintiff was fired. (Id.)  Plaintiff was honest in response to these questions, and the recruiters would tell Plaintiff she should contact the Equal Employment Opportunity Commission ("EEOC") but then never responded back to her. (Id.)

Plaintiff seeks monetary damages, including compensatory, back pay, specific damages, and punitive, as well as costs and fees. (Id. at 23-26.)  She also seeks equitable relief. (Id. at 2.)

Plaintiff appended the EEOC Charge of Discrimination to her complaint. (Id. at 30-32.)  In the section inquiring into the particulars of her EEOC claim, Plaintiff describes being recorded by Barrel Pubs' management without her consent. (Id. at 30.)  She also alleges Barrel Pub fired her after she "sought assistance with this matter." (Id.)  Although she did not attach her EEOC Notice of Right to Sue letter, Plaintiff avers she requested a letter "[o]n or around August 20, 2025," and the EEOC Investigator issued one "immediately." (Id. at 22.)  In one of the emails attached as an exhibit to her amended complaint, Plaintiff states she received a Notice of Right to Sue letter on August 21. (Id. at 34.)

Liberally construing Plaintiff's allegations in her favor and granting her the benefit of all reasonable inferences to be derived from the facts alleged, the Court finds Plaintiff has arguably stated an Equal Pay Act ("EPA") claim. See 29 U.S.C. § 206; Arafat v. Sch. Bd. of Broward Cnty., 549 F. App'x 872, 875 (11th Cir. 2013) (per curiam) ("To state a claim under the EPA, a party must show that the employer paid employees of one gender lower wages for

6

equal work which required 'equal skill, effort, and responsibility, and which [was] performed under similar working conditions.'" (quoting Steger v. Gen. Elec. Co., 318 F.3d 1066, 1078 (11th Cir. 2003))); Huh v. Marktec, Inc., No. 4:24-CV-00100, 2024 WL 5701397, at *3 (N.D. Ga. Dec. 18, 2024) ("While an [EPA] complaint 'need not allege facts establishing each element of a prima facie case of discrimination . . . it must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed.'" (quoting EEOC v. Port Authority of NY and NJ, 768 F.3d 247, 254 (2d Cir. 2014))).

In Count III, titled "Willful Violation of the [FLSA] Misclassification 29 U.S.C. § 215 and 29 C.F.R. part 541, Plaintiff describes that she was paid hourly as a manager yet was expected to perform managerial tasks while off-the-clock and without pay. (Doc. no. 13, pp. 6-7.) Liberally construing her claims, the Court concludes she has sufficiently alleged facts to support FLSA claims for (1) failure to pay overtime and (2) failure to pay minimum wages. See Steiner-Out v. Lone Palm Golf Club, LLC, No. 8:10-CV-2248-T-24TBM, 2010 WL 4366299, at *2-3 (M.D. Fla. Oct. 28, 2010) ("It is true that the amended complaint is not a model of clarity and does not explicitly state whether Plaintiffs are asserting a minimum wage claim, an overtime claim, or both" but nonetheless concluding Plaintiffs sufficiently alleged minimum wage and overtime claims to overcome a motion to dismiss for failure to state a claim); see also 29 U.S.C. § 206(a) (failure to pay minimum wages); 29 U.S.C. § 207(a) (failure to pay overtime wages); Freeman v. Key Largo Volunteer Fire & Rescue Dep't, Inc., 494 F. App'x 940, 942 (11th Cir. 2012) (per curiam) ("To state a claim for failure to pay minimum (or overtime) wages under the FLSA, a plaintiff must demonstrate that (1) he is employed by the defendant, (2) the defendant engaged in interstate commerce, and (3) the defendant failed to pay him minimum or overtime wages."); Steiner-Out, 2010 WL 4366299, at *2 ("[A]

7

reasonable reading of the amended complaint reveals that Plaintiffs are claiming that Defendant did not pay them for all of the hours that they worked, which is in essence a claim that they were not paid a minimum wage for some of the hours that they worked. Furthermore, to the extent that they worked more than forty hours in any workweek in which they were not paid for all of the hours that they worked, their claim can reasonably be viewed as an overtime claim.").

The Court further finds Plaintiff has arguably stated a viable breach of contract, or in the alternative, promissory estoppel claim under Georgia law. See Walthour v. U.S. Bank Nat'l Ass'n, No. 1:15-CV-2875, 2016 WL 4392824, at *5 (N.D. Ga. Feb. 24, 2016) ("In Georgia, the elements of a breach of contract claim are (1) a valid contract; (2) material breach of its terms; and (3) damages arising from the breach." (citations omitted)); Moore v. Emory Healthcare, Inc., No. 1:22-CV-4324, 2023 WL 9689030, at *13 (N.D. Ga. July 3, 2023) ("To allege the existence of an oral contract, the plaintiff bears the burden of alleging facts to support three elements:  subject matter of the contract, consideration, and mutual assent by all parties to all contract terms. (citations and internal quotations omitted)); Anthony v. Concrete Supply Co., Inc., 241 F. Supp. 3d 1342, 1348 (N.D. Ga. 2017) ("Under Georgia law, when an employee sues his employer for unpaid wages, the very existence of the employment relationship gives rise to a contract between the parties." (citations omitted)); Ridgeline Cap. Partners, LLC v. MidCap Fin. Servs., LLC, 340 F. Supp. 3d 1364, 1369 (N.D. Ga. 2018) (explaining "Georgia courts use promissory estoppel to allow enforcement of promises that would fail under traditional rules of contract law" and reciting elements of promissory estoppel claim as "the defendant made a promise upon which he reasonably should have expected the plaintiff to rely, the plaintiff relied on the promise to his detriment, and injustice can be avoided

8

only by enforcing the promise because the plaintiff forwent a valuable right" (quoting Mbigi v. Wells Fargo Home Mortg., 785 S.E.2d 8, 20 (Ga. Ct. App. 2016) (internal quotations omitted))).

Finally, the Court finds Plaintiff has arguably stated claims for invasion of her privacy under Georgia law.  In her amended complaint, Plaintiff titles her invasion of privacy count as "Invasion of Privacy Inclusion upon [S]eclusion (Eavesdropping and Surveillance) O.C.G.A. § 16-11-62."  (Doc. no. 13, p. 10.)  Thus, liberally construing her amended complaint, she appears to allege statutory and common law invasion of privacy claims.  Accordingly, the Court concludes she arguably states claims for:  (1) violations of Georgia's Eavesdropping Act, O.C.G.A. § 16-11-62,[2] and (2) intrusion upon seclusion under the common law.  See Kemeness v. Worth Cnty., Ga., 449 F. Supp. 3d 1318, 1328 (M.D. Ga. 2020) ("Eavesdropping victims can bring civil actions under Georgia's eavesdropping act. . . . The statute itself anticipates civil actions." (citations omitted)); Summers v. Bailey, 55 F.3d 1564, 1566 (11th Cir. 1995) ("The tort of intrusion involves an unreasonable and highly offensive intrusion upon another's seclusion."); Doe v. Wellstar Health Sys., Inc., 799 F. Supp. 3d 1268, 1273-74 (N.D. Ga. 2025) (explaining "[a]n essential element" of intrusion upon seclusion "is a physical intrusion analogous to trespass," which can be satisfied by alleging the defendant "conducted surveillance on the plaintiff or otherwise monitored her activities" (citations and internal quotations omitted)); James W. Wimberly, Jr., Georgia Employment Law § 10:12 (5th ed. 2025) ("Employers may intrude upon an employee's seclusion or solitude, or into his private

---

[2] The case law on whether this Georgia criminal statute creates a private cause of action appears to be unsettled.  See Cohen v. Rogers, 798 S.E.2d 701, 719 (Ga. Ct. App. 2017) ("Even if [defendant] had violated O.C.G.A. § 16-11-62, that would not give [plaintiff] a cause of action.") (J. McFadden, concurring).  However, at this stage in the proceedings, in which the Court must construe all allegations in Plaintiff's favor, the Court concludes it is appropriate to allow this claim to proceed.

affairs, in many ways. Employers may arguably make such intrusions when . . . conducting surveillance upon employees."). But see Cohen v. Rogers, 798 S.E.2d 701, 719 (Ga. Ct. App. 2017) ("Even if [defendant] had violated O.C.G.A. § 16-11-62, that would not give [plaintiff] a cause of action.") (J. McFadden, concurring). However, at this stage in the proceedings, in which the Court must construe all allegations in Plaintiff's favor, the Court concludes it is appropriate to allow this claim to proceed.

Accordingly, this case shall proceed against Defendant Barrel Pubs on the claims specified above. In a companion Report and Recommendation, the Court recommends dismissal of Defendant Jawoski, as well as Plaintiff's Title VII retaliation claim and Americans with Disabilities Act claims.

## II.    INSTRUCTIONS

**IT IS HEREBY ORDERED** that Mr. C. Mitchell Warnock, Jr., counsel of record for Defendant Barrel Pubs, shall have through and including March 27, 2026, to notify the Court if Defendant intends to waive formal service of the amended complaint, or if Defendant intends to bear the cost of personal service. If Defendant waives service, Defendant shall have through and including May 26, 2026, to answer, move, or otherwise respond to the amended complaint.

Individual defendants have a duty to avoid unnecessary costs of serving the summons, and if a defendant fails to comply with the request for waiver, the defendant must bear the costs of personal service unless good cause can be shown for failure to return the waiver. Fed. R. Civ. P. 4(d)(2). A defendant whose return of the waiver is timely does not have to answer the complaint until sixty days after the date the Marshal mails the request for waiver. Fed. R. Civ. P. 4(d)(3). However, service must be effected within ninety days of the date of this Order, and the failure to do so may result in the dismissal of any unserved defendant or the entire case. Fed. R. Civ. P.

4(m). Plaintiff is responsible for providing sufficient information for the Marshal to identify and locate Defendant to effect service.

Every pleading shall contain a caption setting forth the name of the court, the title of the action, and the file number. Fed. R. Civ. P. 10(a). There is no longer any need for a *pro se* Plaintiff to serve copies of court filings on other parties to the case because the Clerk of Court uploads the original filing to the case docket and all represented parties receive electronic notice of the filing and an electronic copy of the filing. For all case-related documents not filed with the Court, such as discovery requests and responses, a *pro se* Plaintiff must continue to serve copies on all parties by U.S. Mail and attach a certificate of service. See Fed. R. Civ. P. 5; Loc. R. 5.1. Likewise, a *pro se* Plaintiff must serve any *pro se* Defendant by U.S. Mail and attach a certificate of service. Any paper received by a District Judge or Magistrate Judge that has not been properly filed with the Clerk of Court or that fails to include a caption will be returned.

It is Plaintiff's duty to cooperate fully in any discovery that may be initiated by the defendant. Upon being given at least five days notice of the scheduled deposition date, Plaintiff shall appear and permit her deposition to be taken and shall answer, under oath and solemn affirmation, any question that seeks information relevant to the subject matter of the pending action. Failing to answer questions at the deposition or giving evasive or incomplete responses to questions will not be tolerated and may subject Plaintiff to severe sanctions, including dismissal of this case. The defendant shall ensure Plaintiff's deposition and any other depositions in the case are taken within the 140-day discovery period allowed by this Court's Local Rules.

While this action is pending, Plaintiff shall immediately inform this Court and opposing counsel of any change of address. Failure to do so will result in dismissal of this case.

Plaintiff must pursue this case; if Plaintiff does not press the case forward, the Court may dismiss it for want of prosecution. Fed. R. Civ. P. 41; Loc. R. 41.1. If Plaintiff wishes to obtain facts and information about the case from the defendant, Plaintiff must initiate discovery. See generally Fed. R. Civ. P. 26 through 37 (containing the rules governing discovery and providing for the basic methods of discovery). Plaintiff should begin discovery promptly and complete it within four months after the filing of the first answer of a defendant named in the complaint screened herein.

Interrogatories are a practical method of discovery for *pro se* litigants. See Fed. R. Civ. P. 33. Interrogatories shall not contain more than twenty-five questions. Id. Plaintiff must have the Court's permission to propound more than one set of interrogatories to a party. Discovery materials should not be filed routinely with the Clerk of the Court; exceptions include when the Court directs filing; when a party needs such materials in connection with a motion or response, and then only to the extent necessary; and when needed for use at trial. If Plaintiff wishes to file a motion to compel pursuant to Fed. R. Civ. P. 37, she should first contact the attorney for Defendant and try to work out the problem; if Plaintiff proceeds with the motion to compel, she should also file a statement certifying that she has contacted opposing counsel in a good faith effort to resolve any dispute about discovery. Loc. R. 26.5.

Plaintiff must maintain a set of records for the case. If papers are lost and new copies are required, these may be obtained from the Clerk of the Court at the standard cost of fifty cents per page.

Under this Court's Local Rules, a party opposing a motion to dismiss shall file and serve his or her response to the motion within fourteen days of its service. "Failure to respond shall indicate that there is no opposition to a motion." Loc. R. 7.5. Therefore, if Plaintiff fails to respond

to a motion to dismiss, the Court will assume that there is no opposition to the defendant's motion and grant the dismissal.

A response to a motion for summary judgment must be filed within twenty-one days after service of the motion. Loc. R. 7.5, 56.1. A failure to respond shall indicate that there is no opposition to the motion. Loc. R. 7.5. Furthermore, each material fact set forth in a defendant's statement of material facts will be deemed admitted unless specifically controverted by an opposition statement. Should a defendant file a motion for summary judgment, Plaintiff is advised that she will have the burden of establishing the existence of a genuine issue as to any material fact in this case. That burden cannot be carried by reliance on the conclusory allegations contained within the complaint. Should a defendant's motion for summary judgment be supported by affidavit, Plaintiff must file counter-affidavits if she desires to contest the defendant's statement of the facts. Should Plaintiff fail to file opposing affidavits setting forth specific facts showing that there is a genuine issue for trial, the consequences are these: any factual assertions made in the defendant's affidavits will be accepted as true and summary judgment will be entered against Plaintiff pursuant to Fed. R. Civ. P. 56.

SO ORDERED this 20th day of March, 2026, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA